## Richmond.

### HATCHER v. HATCHER.

#### JANUARY 29th, 1885.

1. WILLS—*Codicils—Republication.*—Upon a paper, whereon there was writing dated 1858, and purporting to dispose of H.'s property, but without signature or attestation, H., in 1864, wrote another instrument, with the caption "Codicil to the above will," which instrument was duly executed and attested.

HELD:

        The execution of the codicil effects the republication of the will, and brings the latter down to the date of the codicil, so that both speak as of the same date. *Corr* v. *Porter*, 33 Gratt. 278.

2. IDEM—*Rules of construction.*—See opinion for some of these rules.

3. IDEM—*Construction—Case here.*—Testator had five daughters. To each of the three married ones, in his lifetime, he gave two slaves, and confirmed the gift by will of 1858, by which he gave each of his two unmarried daughters, L. and F., two slaves, provided for equal distribution of his other estate, and added: "If anything should happen to the negroes named for L. and F. before they get fully in possession of them, I wish said loss made up to each of them, as I wish to make all my children equal in the division of my estate." By codicil of 1864 he adds: "I wish, at the close of the war, the property not already devised, with the exception of the land and negroes, to be equally divided among my children. The negroes to be hired out, with the exception of Nelly and Henry, who I wish to remain on the farm, and aid in supporting my daughters L. and F. while unmarried, it being my wish that they shall have the farm and the two negroes above named to support them on it, while unmarried, till the year 1871."

HELD:

        1. The loss of the slaves, by emancipation, is within the intention of the testator, and L. and F. are entitled to be compensated for the loss.

        2. L. and F. are entitled to a support, and nothing more, while unmarried, from the farm.

Argued at Wytheville, but decided at Richmond.

Appeal from decree of circuit court of Bedford county, entered 4th June, 1883, in the chancery cause wherein Robert H. Jeter, executor of Julius H. Hatcher, deceased, and others were defendants, and James W. Hatcher and Laura, his wife, and Benjamin Noel and Florella, his wife, were complainants. The object of the suit was—first, to hold the estate of the testator, Julius H. Hatcher, deceased, bound to indemnify the plaintiffs for the loss of the slaves which had been specifically bequeathed to them, it being alleged that these slaves had never come to their possession under the will of their father, but were made free by the result of the war, and that this loss, by emancipation, was a loss provided against by their father's will; and second, to have paid to them the value of the crops raised on the farm for the year 1865, which crops they claimed to be entitled to under the codicil.

The cause being heard, the circuit court decreed in favor of the plaintiffs on the first proposition, and from the decree the executor of Julius H. Hatcher obtained an appeal to this court.

Opinion states the facts.

*Burks & Burks*, for the appellants.

*E. P. Goggin*, for the appellees.

HINTON, J., delivered the opinion of the court.

The question in this case arises upon the construction of the second clause of article 6th of the will of Julius H. Hatcher, deceased, which is in the following words:

" Also if anything should happen to the negroes named for Laura and Florella before they get fully in possession of them I wish said loss made up to each of them as I wish to make all my children equal in the division of my estate. I wish no difference to be made among them."

Now the first and great rule in the exposition of wills, to which all other rules must bend, is that the intention of the testator expressed in his will shall prevail, provided it be consistent with the rules of law. *Smith* v. *Bell*, 6 Pet. 75. But this intention must be collected from the words of the will, for the object of construction is not to ascertain the presumed or supposed, but the expressed intention of the testator, that is, the meaning, which the words of the will, correctly interpreted, convey. The expressed meaning being, in wills, as in other written instruments, in legal contemplation, equivalent to the intention. *Shore* v. *Wilson*, 9 Cl. & F. 525; *Wootten* v. *Redd*, 12 Gratt. 205. And in order the better to comprehend the scheme which the testator had in his mind for the disposition of his estate, the judicial expositor is permitted to place himself, figuratively speaking, in the very shoes of the person, whose will he is called on to construe, and with the aid of such extrinsic evidence as is admissible for the purpose, possess himself of the condition of the testator and his family and of such surrounding facts and circumstances as may be reasonably supposed to have influenced him in the disposition of his property. *Wootten* v. *Redd*, 12 Gratt. 205; *Hooe* v. *Hooe*, 13 Gratt. 245; *Williamson* v *Coulter*, 14 Gratt. 398. With the lights thus afforded him, he is prepared as well as it is possible for him to be, without letting in evidence of the testator's actual intention as contradistinguished from his written meaning, to declare, upon a careful examination and comparison of all parts of the will, what is the meaning of the words which the testator has seen fit to employ. Now here, the testator was a man possessed of a fair estate; with five daughters, for all of whom he desired to provide alike. He had already given to each of the three, who were married, two slaves; and of these the daughters had been in possession for several years. In March, 1858, he gives in articles 1, 2 and 3 of an instrument in writing, which is neither signed nor attested however, to each of these three married daughters, the same slaves of which he had put them in posses-

sion; and by articles 4 and 5 of the same instrument he gives as follows:

"Article 4th. I give to my daughter Laura [now Mrs. Hatcher, and one of the appellees], and the lawful heirs of her body Ellen and her increase and boy Ramsey, also the balance of property that may fall to her after my death in an equal division of the same.

"Article 5th. I give unto my daughter Florella [now Mrs. Noell, and one of the appellees], and the lawful heirs of her body, Charlotte and her increase and boy Jimmy and the balance of property that may fall to her after my death in an equal division of the same."

And then by the first clause of article 6th he directs: "Should it not be done in my lifetime I wish given after my death to each of my daughters, Laura and Florella a good horse, bridle, saddle, cow and calf, bed and furniture, all of good quality, say No. 1." He had by the previous articles of the will given chattel property of the same kind to each of the married daughters. In September, 1864, he wrote upon the same paper another instrument, with the caption "Codicil to the above Will," and this instrument is duly executed and attested. The first and second articles of this codicil are as follows:

"Article 1st. I wish all my daughters jointly to enjoy the control and management of my property not devised at my death for their maintenance as long as the war lasts, provided they make my present residence their home. If any of them think they can make better arrangements they are at liberty to do so, and take the property I have already devised them. Out of the proceeds of the farm, &c., I wish Laura and Florella to be allowed money to furnish necessary apparel. I also wish at the close of the war the property not already devised with the exception of the land and negroes, to be disposed of and divided equally among all my children then living and the heirs of such as may be dead. The negroes to be hired out with the exception of Nelly and Henry who I wish to remain on the

farm to aid in supporting my daughters Laura and Florella while unmarried, it being my wish that they shall have the farm and two negroes above-named to support them on it while unmarried till the year 1871. That is, I wish them to have my home as theirs for a support if unmarried and the two negroes named above till 1871. But they are at liberty to make other arrangements if they think best while one or both remains unmarried. If either of them marry, this provision for them while unmarried ceases.

"Article 2nd. After January 1st, 1871, I wish all my property of every sort and kind, not already devised, to be equally divided among all my children then living, and the lawful heirs of such as may be dead."

The testator died within a week after the execution of this paper; and the slaves were emancipated as one of the results of the war. And the appellees, Laura and Florella, never having acquired possession of the slaves bequeathed to them, it is for the court to determine whether they are entitled to be compensated for the loss thus sustained or not.

The codicil, it is admitted, operates as a republication of the will, and the effect of the republication is to bring down the will to the date of the codicil, so that both instruments are to be considered as speaking at the same date and taking effect at the same time. *Corr* v. *Porter*, 33 Gratt. 283. 1 Jar. on Wills (Bigelow's ed.), section 4, 114 *et seq.* 1 Redfield on Wills, 287 *et seq.* And in this case, as there is nothing in the language of the will to indicate a contrary intention it must be held to speak from the death of the testator. Code 1873, chapter 118, section 11. *Canfield* v. *Bostwick*, 21 Conn. 550. But as this is a matter of little consequence either way, I lay no stress upon it.

In this case we can have no difficulty in discovering what was the intention of the testator, for it is not left to implication, but is expressed in nearly every article of both will and codicil. He clearly intended to make them all equal in the distribution

of his estate, and *his mode* of doing this was to give to each of his children, amongst various other kinds of chattel property, two slaves. He had already placed the married daughters in possession of the slaves which he designed for them, and his purpose was to put his unmarried daughters in possession of an equal number, and failing in this to give them an equivalent in money. It may be that he did not contemplate the emancipation of the negroes as the result of the war as *one* of the means by which his purpose might be defeated, or, it may be that although he did contemplate this contingency as one of the means by which his purpose might be defeated, he yet chose, out of abundance of caution, to say what disposition he desired made of them in the event of their not being emancipated. His conduct in the premises is certainly susceptible of both constructions. For whilst the direction to hire out the negroes until the year 1871, does show, that he contemplated, even at that late period of the conflict, as a probable contingency, that the Confederate cause might ultimately prove successful; it does not show, however, that he did not contemplate the downfall of the Confederacy and the consequent abolition of slavery, as a possible contingency. But, however this may be, it is certainly clear that the testator contemplated that something might happen by which slaves might be wholly lost to his two unmarried daughters, and it is equally clear that, in that event, he intended that these children should be paid the value of the slaves. His purpose therefore was in certain contingencies to require that these children should be indemnified out of his estate to the extent of the full value of these slaves, and this was the way in which he proposed to equalize the distribution of his estate amongst his children, and it is the only way which he has marked out for that purpose. The question therefore is, can this intention, under the rules of construction applicable to wills, be made to prevail? We think it can.

It is argued by the learned counsel for the appellants with great force and ingenuity, and I was for a long while of the

same opinion, that the language of the will is not "if anything should happen" before the legatees got possession, whereby the slaves were lost to them, but it is "if anything should happen *to* the negroes;" and that this language naturally implies some accident or casualty, such as personal injury, death or disease, by which the value of the property is either destroyed or seriously impaired. Admitting that such is the usual import of these words, we still think that it is allowable to give to them such a construction as will carry out the primary intention of the testator.

In *Key* v. *Key*, 4 D., M. & G. 73, Sir Knight Bruce, L. J. said: "In common with all men, I must acknowledge there are many cases upon the construction of documents, in which the spirit is strong enough to overcome the letter; cases in which it is impossible upon a careful perusal of the instrument, not to be satisfied from its contents that a literal, a strict, or an ordinary interpretation given to particular passages, would disappoint and defeat the intention with which the instrument, read as a whole, persuades and convinces him that it was framed. A man so convinced is authorized and bound to construe the writing accordingly."

In *Grey* v. *Pearson*, 6 H. L. Cas. 61, Lord St. Leonards said: "Nobody is more disposed than I am to abide by clear words, and to give to them their natural and grammatical meaning; but I never did and never can come to the conclusion, that the words of a will cannot admit of modification according to the real intention of the testator, as you find it from other expressions, or from the whole context of the will. It is difficult to lay down, says he, any abstract rule upon the subject, but where I find the intention, and I find words pointing out the intention, and that if I give to the words their simple meaning according to grammar and according to their *prima facie* import, I defeat the intention,—I hold that I am bound, by every rule both of law and equity, to see whether I cannot give to

them by natural construction, an import which will effectuate and not defeat the intention."

And in *Abbott* v. *Middleton*, 7 H. L. Cas. 94, the same great judge said: "But if, upon the whole frame of the will, I am satisfied of what was his general intention, I start with that general intention. It will not enable me to alter words; but, having ascertained the intention, then I have to ask, whether I can or cannot so construe the words actually used as to carry out the intention."

Now here we are all clearly satisfied that the general scheme or intention of the testator was to distribute in kind certain different species of chattel property among his children, and then to divide the remainder of his estate equally amongst them. But it was also part and parcel of this scheme, that if these unmarried daughters should fail to get full possession of the slaves intended for them, that they should be indemnified for any loss they might thus sustain; and being so satisfied, the words "if anything should happen to the negroes named for Laura and Florella before they get fully in possession of them," &c., must be held to include a loss resulting from the contingency which has happened. By doing so we certainly effectuate the general intention and do no great violence to the literal meaning of the words.

Upon the point that Laura and Florella were entitled to the proceeds of all the crops for the year 1865 we agree with the learned judge who decided this cause, that they were simply entitled to a support.

The decree of the circuit court of Bedford county must be affirmed.

DECREE AFFIRMED.