CASE 7—CONTESTED WILL—DECEMBER 15.

## Stewart, &c., v. Mulholland, &c.

APPEAL FROM JEFFERSON COURT OF COMMON PLEAS.

1. THE MARRIAGE OF A WOMAN DOES NOT REVOKE A WILL PREVIOUSLY
    MADE by her, where the will was made with the consent of the in-
    tended husband, and he, subsequently, by an antenuptial contract,
    relinquished all interest in her estate, and agreed that she should
    hold it to her separate use, and have the power to dispose of
    it by will. As the reason for the statute (Gen. Stat., chapter 113,
    section 9) does not exist in such a case, it does not apply.

    In this case the intended husband, having consented to enter into
    such an antenuptial contract, the wife made a will before the con-
    tract was executed, and notified the husband of the fact. Three
    days thereafter the proposed contract was executed, and on the
    same day the marriage ceremony was performed. After the mar-
    riage the wife, in the presence of her husband, handed the will
    to a friend for safe-keeping, telling him that it was her will,
    and afterwards repeatedly recognized it as her will. Heirs of the
    testator who were not provided for in the will object to its pro-

Stewart, &c., v. Mulholland, &c.

bate. The husband does not complain. *Held*—That the execution of the will and contract, and the performance of the marriage ceremony, were so directly connected as to make the whole but one transaction; but, even if not, the statute, under the circumstances, does not apply, and the marriage did 'not revoke the will.

2. WHERE A WILL HAS BEEN ONCE REVOKED new life can not be imparted to it, except by a re-execution; mere recognition is not sufficient.

If the will in this case had been revoked by the marriage, it would not have been revived by the subsequent recognition, although a holographic will.

BROWN, HUMPHREY & DAVIE FOR APPELLANTS.

1. If the marriage of Mrs. Stewart revoked her will, it was revived by her repeated acknowledgments and declarations of it as her existing will after the marriage; the will being wholly in her own handwriting, and she having full power to make a will during the marriage. (Porter v. Ford, 82 Ky., 191.)

2. The cases of Maxwell's will, 3 Met., 101, and Dougherty's will, 4 Met., 25, were cases of papers that were to become wills only upon contingencies. And the case of Phaup's will, 14 Grattan, 332, is not in point, because the will there required two attesting witnesses, and it was never reattested nor reacknowledged before both of the attesting witnesses.

3. The marriage, the marriage contract, and the will were all parts of one transaction, and by the marriage contract Mrs. Stewart was to retain and dispose of her property as her own, free from any interest of her husband, and with full power to make a will. Her husband assented to the validity of this will, and, in effect, agreed that this will should stand unrevoked by the marriage, and it was delivered for safe-keeping after the marriage, on the same day, and with the husband's approval. The statutes declaring that marriage shall revoke all wills, except those executed in pursuance of powers, and that no revoked will shall be revived, except by the re-execution thereof, are not applicable to such a case; and the will of Mrs. Stewart, not being within the reason of those statutes, was not revoked by the marriage. (Osgood v. Bliss, 141 Mass., 474; Taylor v. Raines, 7 Modern Reports, 148; Logan v. Bell, 1 Common Bench, 872; Case of Ward's Will, 70 Wisconsin, 257.)

JAMES S. PIRTLE FOR APPELLEES.

1. A will once revoked can be revived in no other way than by re-execution or by a codicil. (Gen. Stat., chapter 113, section 11; Maxwell v. Maxwell, 3 Met., 101; Phaup v. Wooldridge, 14 Gratt., 332; Dougherty v. Dougherty, 4 Met., 25.)

The case of Porter v. Ford, 82 Ky., 191, is unlike this case, and does not justify the construction given it by counsel for appellants.

2. The statute does not make the marriage a presumptive revocation which may be rebutted by proof of a contrary intention, but it makes it operate *es instanti* as a revocation. (Gen. Stat., chapter 113, section 9; Brown v. Clark, 77 N. Y., 369; McAnnulty v. McAnnulty, 120 Ill., 26; Blodgett v. Moore, 141 Mass., 75; 5 J. J. M., 471–73.)

3. The will can not be upheld as the execution of a power, as the testatrix disposed of her own property by the revoked will. Besides, the power relied on was limited to a will made after marriage, while the will in controversy was made before marriage. (Hodsden v. Staple, 27 R., 684; Hodsden v. Lloyd, 2 Brown's Ch'y Cases, 534.)

The statute construed by Osgood v. Bliss, 141 Mass., 474, is less comprehensive than ours, and the facts in the two cases are different.

WM. LINDSAY AND JAMES S. PIRTLE IN PETITION FOR REHEARING.

1. As the point upon which this court reverses the judgment was not relied on by the appellants upon the hearing of the appeal, and was not discussed or considered, a reargument should be ordered.

2. The statute is peremptory. No evidence, however convincing, can be received to rebut the conclusive legal implications of revocation arising out of the subsequent marriage. (Gen. Stat., chapter 113, section 9; Nutt v. Norton, 142 Mass., 242; Brown v. Clark, 77 N. Y., 373; McAnnulty v. McAnnulty, 120 Ill., 126; 5th ed. Jarman on Wills (Bigelow's), vol. 1, pp. 128–9; Williams on Executors, Perkins' ed., vol. 1, p. 239.)

The statute was not, in this view, an innovation upon Kentucky practice. (Sneed v. Enings' Ex'r, 5 J. J. M., 471.)

3. Limitations upon the power to make wills, and conditions looking to their revocation, invade none of the rights of the citizen. (Moore's Trustee v. Howe's heirs, 4 Min., 201.)

4. The reasoning of the opinion, based as it is upon the consent of the husband to the will in controversy, leads to the conclusion that the will should, at all events, be proved only as a will of personalty. (Yates' Will, 2 Dana, 217.)

5. The statute was not made alone for the benefit of husbands and wives. It was intended to serve a public purpose, and any party having a sufficient interest may insist upon its enforcement.

6. The antenuptial contract neither confirmed nor adopted, nor attempted to revoke, the will then in existence. Nor does it evidence a purpose upon the part of the contracting parties to withdraw the will from the operations of the public law.

Stewart, &c., v. Mulholland, &c.

JUDGE PRYOR DELIVERED THE OPINION OF THE COURT.

Mrs. Mary Hall Jacob, being about to intermarry with James R. Stewart, was desirous of entering into an antenuptial contract, by which she could secure to herself the right to hold and use her property as her separate estate, and to make such disposition of it as she saw proper by last will and testament. She communicated her wishes to her intended husband, and, obtaining his consent, prepared a will in her own handwriting, by which she devised her estate, one-half of it to her future husband, Stewart, and the remaining half to her two nieces, excluding from the general devise an interest in a dwelling-house in Elizabethtown that she devised to her nephew. She had three brothers and a nephew who were not made the beneficiaries by that instrument, and who are now contesting its probate. A sister of Mrs. Jacob had died many years before the date of the will, leaving children, and among them two infant daughters, one eight days old and the other two years of age. These children were taken charge of by Mrs. Jacob, and raised by her to womanhood, and are made, together with her husband, the objects of her bounty in the disposition she has made of her estate. The will is dated on the ninth of January, 1876; the marriage contract seems to have been written on the eleventh of January, two days after the will was written, and signed by the contracting parties on the twelfth of January, the next day, and the same day on which the marriage ceremony was performed.

After the ceremony was over, and the parties made

man and wife, the wife, on her way from Elizabethtown to Louisville, on the same day she was married, handed the paper enclosed by an envelope to a friend of hers, telling him to keep it safely, that it was her will. This was in the presence of her husband. This friend, the husband of her deceased sister, took charge of the paper and placed it in the vaults of a bank, where he kept it for three or four years, and Mrs. Stewart, having removed to Wisconsin, it being her husband's home, wrote, after the lapse of three or four years, to her friend to send her the will. This he did. The will was received by her, and kept in a tin box in her custody and that of her husband until offered for probate. The paper is identified by Samuels, the friend with whom it was left, as the same paper he had the custody of, he having read it, and is identified as the same paper received by Mrs. Stewart from Samuels, and the same taken from the tin box after her death; that she spoke of her will often while living in Wisconsin is abundantly established, and that the paper offered for probate is the paper alluded to by her is settled beyond controversy. The preparation and the execution of this paper by Mrs. Stewart on the eve of her marriage is not in fact controverted, or, if denied, is a fact well established.

The propounders of the paper as the last will of Mrs. Stewart are met with the objection by her three brothers, who are the contestants, that the marriage of their sister with Stewart revoked her will, by reason of an express provision of our stat-

ute in regard to wills, and the court below, adopting that view of the case, denied its probate. The ninth section of chapter 113, General Statutes, title "Wills," provides: "Every will made by a man or woman shall be revoked by his or her marriage, except a will made in the exercise of a power of appointment when the estate thereby appointed would not, in default of such appointment, pass to his or her heir, personal representative, or next of kin." Section 11, of the same chapter, also provides, that "No will or codicil, or any part thereof, which shall be in any manner revoked, shall, after being revoked, be revived, otherwise than by re-execution thereof, or by a codicil executed in the same manner hereinbefore required, and then only to the extent to which an intention to revive the same is shown thereby."

It is manifest, under these two sections of the statute, that a will once revoked can only be revived by a re-execution of the instrument in the manner pointed out by the statute. It is in fact the making of another will, and must be executed in the same manner in which the original will was required to be executed.

The will offered for probate is all in the handwriting of the testatrix, who, at the time of its execution, was the widow of Jacob, and it being holographic, it is contended that its preservation by Mrs. Stewart for so many years, and her frequent recognition of the paper as her will, so often made during a long period of time, amounts not only to a republication of the paper as her will, but such

an execution of the instrument as makes it a complete will. There can be no doubt, from the testimony of those intimately acquainted with the testatrix, that she always, from the date of the execution of the paper until her death, regarded it as her last will, and as having given her property to those whose claim upon her affections made them the objects of her bounty. This manifest intention, however plain on the part of Mrs. Stewart, will not be permitted to override the plain letter of a statute that was enacted for the purpose of preventing a litigation over the question of intent, and admitting to probate a paper already revoked, that has no stronger proof of its validity than the mere intention of the maker to impart a new life to the instrument.

The statute in regard to wills, and particularly the two sections referred to, with their meaning and purpose properly understood, leaves but little room for construction. This court, in the case of Porter v. Ford, reported in 82 Ky., 191, where testatrix executed a paper in her own handwriting, purporting to be her will, while she was a married woman, and after she became discovert, not only recognized the paper as her will, but made indorsements upon it to that effect, *held*, that as she was then capable of making a will, such a recognition made it a valid instrument, and, being all in her own handwriting, there was nothing in the statutes requiring the paper to be rewritten or resubscribed by her after her disability was removed, in order to make it a testamentary paper. It was also held in that case, in construing the section of the statute in regard to revocation, that

the section did not apply, because the paper, at no time during the coverture, was valid, but absolutely void, and its recognition after the death of her husband gave to the paper, for the first time, legal vitality. That case, relied on as authority in this case in support of the will, is not analogous, because the question here involved is whether this will of Mrs. Jacob had ever been revoked; for, if revoked, new life could never be imparted to it by mere recognition or a republication, because the statute requires where a will has been once revoked there must be a re-execution, and the will of Mrs. Jacob can not well be held to be the will of Mrs. Stewart, if that paper was revoked by the marriage with Stewart. By the rule of the common law, the marriage of a woman revoked a will previously made by her, because, if allowed to stand, it would affect the marital rights of the husband, and during marriage no power existed by reason of the disability of the wife, either to revoke, alter or make another will. At common law, however, when the wife had the right of disposing of her separate estate by an antenuptial agreement, her will previously made was not revoked by her subsequent marriage, and in this State a married woman may dispose of her separate estate by last will and testament. (General Statutes, chapter 113, section 4.) In this case the power to make a will during the marriage, and the separate estate in the wife, existed by reason of the antenuptial contract between Mrs. Jacob and her intended husband, executed on the twelfth of January, 1876, the day on which the marriage ceremony was performed, and two days after the date

of the will. It is therefore contended that, as the will of Mrs. Stewart, then Jacob, was executed on the ninth of January, it was revoked by the marriage, and not having been re-executed, her estate descends to her heirs at law. This position is based on the section of the statute referred to, by which a will made prior to the marriage is revoked, unless made under a power to dispose of property that would not, if undisposed of, pass to the heirs and representatives of the donee of the power, the argument being that it is immaterial how the power to make such a will is conferred, whether by a contract between the wife and a stranger, or by reason of an antenuptial contract; if the property disposed of by the will before the marriage is the property of the wife, the subsequent marriage revokes it. That the statute is imperative, and no contract by which a will is made prior to the marriage can affect its provisions, although the will is made by the consent of the husband, and under a contract that fixes definitely the marital rights of husband and wife. It must be conceded that the wife at no time from the date of the will until her death was disqualified by the disability of coverture, or from any other cause, so far as appears in the record, from making a valid disposition of her estate by last will and testament, and while this same fact exists in regard to her husband, we perceive no reason why the parties, when about to consummate the marriage, may not agree that the wife may, by will, dispose of her estate as she sees proper, or that a will already made may retain its legal virtue. after the marriage, and particularly in a case like this.

The will was executed by the intended wife in pur-
suance of the antenuptial contract. It was made
and published, by the consent of the husband, he
having, by the marriage contract, relinquished all
interest in her estate. It was executed as if the con-
tract had been signed and the marriage ceremony
performed, and was so directly connected with those
two events, as to time, place and circumstance, as to
make the whole but one transaction. The intended
husband, before he left his home in the Northwest
to consummate the marriage, had agreed that the
wife's estate should be secured to her. On the tenth
of January, 1876, after reaching her home in Ken-
tucky, she told him that she was then writing her will,
or had written it. The antenuptial contract is dated
on the eleventh, but executed by both the parties on
the twelfth, the day on which the ceremony of mar-
riage took place. After the marriage and on the same
day she was leaving her home, the wife, in the presence
of her husband, confided her will to the custody of
her friend in Kentucky, in pursuance of the contract,
and, we must presume, with a full knowledge of the
statute on the subject of the revocation of wills; and
from the date of the marriage until the death of the
wife, the paper in question was recognized by both as
the will of the wife, although the husband was not
aware of its contents.

Giving to the statute in question a reasonable con-
struction, is there any rule of law that would require
a court to sever the dates of the two writings and
the date of the marriage, with a view of determining
that the will of the wife was revoked by the marriage,

and the testamentary disposition made by the wife under such circumstances disregarded? The will was in execution of the marriage contract. That contract was signed on the day the marriage took place; it was delivered, although dated on the ninth, to the friend, of the wife on that day for safe-keeping, and must be regarded as a part of the entire transaction.

The reason for the enactment of this statute was to prevent fraud upon the husband or wife, by reason of a will executed by the one or the other prior to the marriage, and the disturbance or change that would necessarily arise from such an act on the marital relation, in so far as it affected the right of property, and in case of an unmarried woman for the additional reason that after the marriage the wife would be incapable of making, revoking or altering her will. In this case the marriage never deprived Mrs. Stewart of the power to revoke the will made or the power to make a new will. This right she could have exercised at any time, and when the husband surrenders at the same time his marital rights, even if these transactions can not be said to have taken place on the day of the marriage, who has the right to complain but the husband? His marital rights are preserved or relinquished at his own instance and by the agreement, and the statute can not apply, because the very reason for its enactment has been removed. It is not a question here whether the will was properly executed, for its validity prior to the marriage ceremony is not controverted; nor does the question arise as to whether or not a holographic will, once revoked, can be revived by a republication, when the statute requires a re-ex-

ecution, but the question is, was the will of Mrs. Jacob revoked by her marriage with Stewart? It is conceded that, by a contract, the property rights of either could be regulated and fixed, but when a will is made in pursuance of that contract, and in this instance where it is directly connected with the act of marriage, we are asked to say that the marriage revoked the will, because dated two days prior to the antenuptial contract and the marriage ceremony. The marital rights having been settled by their agreement, and no one else being interested, directly or indirectly, but the husband, why should the will of the wife be revoked? It could have no effect on after-born children, because, by section 24, of chapter 113, they, and not the devisee, take the estate, unless the child should die under age and unmarried and without issue. Was the statute intended to apply to any such case as this? It is argued that the exceptions made by its provisions excluded the idea of any other exception. Should such a construction be given its provisions? If there had been no exception, then the language of the statute might have been held to embrace every will made by a married woman, whether under the exercise of a power or not, and to remedy this, the statute was enacted making an exception where the marital rights could not be affected by the execution of the power. It was to protect the marital rights of parties that the statute was enacted, and it was never designed to prevent parties, by written contract, from fixing their marital rights, and to give to one or both, by an antenuptial contract between the two, the power to dispose of their estate

vol. 88—4

by will. It is idle to say that, by a deed evidencing
a marriage contract, the parties about to consummate
it can, before marriage, fix and determine their right
to property, by reason of the marital relation that is
binding on both, and can not, under the same con-
tract, agree that the one or the other shall dispose of
their property by a will already executed if made as
the statute requires. The will made by the wife in
this case was as much a part of the marriage con-
tract as if it had been inserted in it. In the case
of Phaup v. Wooldridge, 14 Gratt., 332, relied on
by counsel for the appellee, the testator made his
will that was properly signed and attested in the year
1852. Some two years thereafter he intermarried with
Mrs. Bass, and by an antenuptial contract she sur-
rendered all interest in his estate. The question in
that case, under a statute similar to ours, was whether
the marriage to Mrs. Bass revoked the will of Phaup.
The wife was not a party to the litigation, but the will
was assailed by the heirs. The court held that the
marriage did revoke the will, and that the recogni-
tion by the testator, in the presence of one of the
witnesses of the instrument as his will, was not a
re-execution; the court further holding that marriage
alone, save in the exception made, was an absolute
revocation, and that the marriage settlement in no-
wise affected the construction to be given the stat-
ute. While the construction in that case sustains the
views of counsel and the judgment below, the facts
are not at all analogous to the case being consid-
ered. There the will of Phaup was made long before
his marriage, and when he was about to marry Mrs.

Bass two years after an agreement was entered into by which the wife was empowered to devise her estate, and in consideration of that fact relinquished all interest in his estate. She made no will nor was she asserting any claim to his property, nor did they contract with reference to the will already made by the future husband. It was a naked proposition submitted to the court as to whether or not the marriage revoked the will. If Mrs. Bass, in that case, in pursuance to the power given her to make a will by the marriage contract, had, in the exercise of the power and on the eve of the marriage, executed her will, we are inclined to doubt that the court would have permitted the husband to have asserted his marital rights and held the will void, because dated two days before the marriage, when made in pursuance of the antenuptial agreement; still the reasoning of the court in that case, and the construction given the statute, would lead to the conclusion that the will would have been held to have been revoked.

In the case of Osgood v. Bliss, reported in 141 Mass., 474, the parties were married in the State of Indiana, and on the eve of the marriage made an antenuptial contract, by which it was agreed that the marriage should not revoke a will that had been made by the intended wife. The husband had never seen the will, and knew nothing of its contents, yet he signed the agreement. The statute of Indiana contained no exceptions, but provided: "After the making of a will by an unmarried woman, if she shall marry, such will shall be deemed revoked by such marriage." The wife dying, the husband claimed

about twelve thousand dollars in money or choses in action, that she had disposed of by her will, on the ground that the marriage rendered the instrument a nullity. The Supreme Court of Massachusetts held that the marriage did not revoke the power to make the will. It is true in that case the court draws the distinction between the execution of a power and the execution of the will, and bases its conclusion on that distinction. They proceed to say that the reason given for holding that marriage is deemed to be a revocation of a woman's will is because by the marriage she divests herself of the power of revoking it, and destroys the power to change or alter it. It is argued that such reasoning does not apply to an appointment by will, and, for that reason, it was held that the marriage was not a revocation. The argument is well founded and based on the common law rule, and the statute but follows it, and as such reasoning can not apply to the exercise of a right by a married woman to make a will when she, at all times before and after the marriage, had the legal capacity to make a will, that case supports directly the principle recognized in this case. Besides, the marital rights of both husband and wife are fixed by the very contract under which the disability of coverture, in so far as it stands in the way of the execution by her of a will, is entirely removed.

We are satisfied that a proper construction of the statute should not confine the court to the one exception of the exercise of a power to make a will by a married woman, when disposing of the property of another, or of property that would not pass to her

heirs, but that the contract rights of husband and wife, determining the right of property and fixing the status of the marital relation in that respect before the marriage, although it may recognize the existence of a will then made, if properly executed, should be regarded, and that such cases are not embraced by the statute. The statute of Wisconsin provided in reference to such wills, "Excepting only that nothing contained in this section shall prevent the revocation implied by law from subsequent changes in the condition of the testator." The court held that the revocation implied by law evidently means such as would be implied at common law—"the marriage of a woman was the revocation of her will previously made." Ann Ward, living in Wisconsin, made a will during her second marriage, by which she gave her property to her children by her first husband. She had no issue of the second or third marriages. By the laws of that State a married woman has the right to dispose of her estate by will. Having made the will during her second marriage, she married Ward, her third husband, and shortly after died. Her will was admitted to probate, the Supreme Court to which the appeal had been taken, saying: "To hold that marriage of itself revoked a former will of the wife under the circumstances here presented, when, on the next day after the marriage she had the power to reinstate the same writing as her last will and testament, would seem to be absurd." (Will of Ward, 70 Wis., 251.)

In view of our statute it seems to us that it would be trifling with the rights of the husband and the devisees of Mrs. Stewart, to so construe its provisions

as to destroy the testamentary act of the testatrix, and, if no other reason exists for denying the probate of this paper, it should be admitted to probate as the last will of Mrs. Stewart, formerly Jacob.

The judgment is . reversed and cause remanded for proceedings consistent with this opinion.