# CHARLESTON.

## Francis v. Marsh.

Submitted January 20, 1904—Decided February 2, 1904.

1. Will.

Under section 6 of chapter 77 of the Code of 1899, a will made by a man is revoked by his subsequent marriage, although made in contemplation of marriage and containing clauses by which provision is made for a wife in case he shou'd have one living at the time of his death. (p. 546).

2. Will—*Marriage.*

Said section was substituted for the common law rules governing revocation by marriage and marriage and birth of issue, for greater stability of titles and property rights, and, to effectuate the legislative intent, it must be enforced as written, without exception. (p. 547).

3. Will—*Husband and Wife.*

In adopting said section together with section 8 of said chapter, providing for revival by re-execution or codicil, the legislature did not impair the right to dispose of property by will. It only prescribed a reasonable regulation for the exercise thereof. (p. 552).

4. **WILL—*Codicil.***

A codicil, to effect the revival of a revoked will under section 8 of chapter 77 of the Code, must show an intent to revive, but any language therein from which such intent may reasonably be inferred, such as a reference to the will by date, or as being the will of the tetstator, in the absence of contradictory matter found on the face of the codicil or in the surrounding circumstances, is sufficient. It need not show that the testator knew the will had been revoked, nor contain words of express revival, ratification or confirmation of the will. (page 554).

5. **WILL—*Codicil—Executor.***

A duly executed codicil in the following terms: "I, J. C. M., do make this a codicil to my will made on the 6th day of August, 1895, I do nominate and appoint J. B. W. as one of the executors of my will and do hereby revoke the appointment of W. R. J. to said will," revives the will therein referred to. (p. 559).

Appeal from Circuit Court, Lewis County.

Action by Sevilla Francis and others against Dora Marsh and others. Decree for defendants, and plaintiffs appeal.

*Affirmed.*

LINN & BLAND, for appellants.

W. W. BRANNON and A. EDMISTON, for appellees.

POFFENBARGER, PRESIDENT:

This case presents two questions. One is whether a will, made by a man, showing affirmatively, on its face his contemplation of future marriage, and making provision for his future wife, in case of marriage, is excepted from the operation of section 6 of chapter 77 of the Code of 1899, declaring that, "Every will made by a man or a woman shall be revoked by his or her marriage, except a will made in exercise of a power of appointment, when the estate thereby appointed would not, in default of such appointment, pass to his or her heirs, personal representative, or next of kin."

On the 6th of August, 1895, John C. Marsh, a widower, and the father of several children, made a will, the second clause whereof reads as follows: "If so be I have a wife living at the time of my decease I will to her use one-third of the land

I may own at that time to her use during life time I do so order and will it and do also will and bequeath to said wife if such exist one-third of my personal estatte to her entire use." In the fifth, seventh, ninth, and possibly other clauses, there are references to the possible, future wife, accompanied by gifts to her, without naming her or indicating any particular person as his intended wife. On the 3rd day of October, 1895, Marsh married. Did the testator intend, by these provisions, to avoid the effect of the statute? If so, is it possible to effectuate such intent? Can the law thus be nullified? It is not pretended that this will can stand if the legislature intended to make marriage revoke a will executed antecedent to the marriage without reference to the intent of the testator. So construed, the legislature does not take away, or impair, the right to dispose of property by will. It enables the maker of the revoked will to give it effect by re-execution or revival. It regulates and prescribes the mode of exercise of such power and right. The question then is, not one of legislative power, but of legislative intent.

The Kentucky statute, on this subject, is exactly like ours, and in *Stewart* v. *Mulholland,* 88 Ky. 38, the court declared an exception to the statute, but the case, in its facts, differed widely from this one. The will was made by a woman with the knowledge and consent of her intended husband, who subsequently, by an ante-nuptials contract, relinquished all interest in her estate and agreed that she should hold it to her separate use and have power to dispose of it by will. Three days after the contract was executed, and on the day of the marriage, and after the performance of the ceremony, the wife, in the presence of her husband, handed the will to a friend for safe keeping, telling him that it was her will. As the contract empowered the wife to hold her property to her separate use and dispose of the same by will, the court held that the reason of the common law and of the statute for making marriage revoke the will of a woman no longer existed in that case, and the statute had no application. Had the will been made by the husband prior to his marriage, this reasoning would have been plainly fallacious, and without any foundation whatever. For some reason, entirely distinct from that upon which the common law revoked the will of a woman because of

marriage subsequent to its execution, the Statute of Wills, 1 Vic. C. 26 section 18, from which our statute and the Kentucky statute were taken, makes the marriage of a man revoke his will.

At common law, the marriage of a woman absolutely revoked her will, except in the case of a will made in the exercise of a power of appointment. This rule was in logical conformity with the marital rights existing between husband and wife, in consequence of which a married woman could not make a will. Having no power to make a will, she could not revoke one, revocation being as much a testamentary act as the act of making an ordinary will. Hence, but for the act of the law, in revoking on account of subsequent marriage, it would have become irrevocable because of marriage, and so would have lost one of the essential characteristics of a will, namely, revocability at the pleasure of the maker thereof. By the common law, the legal existence of the wife was merged in that of her husband, in consequence of which she could have no power or control over her will during coverture, and her will could not then be ambulatory in its character. 1 Jar. Wills, 110; *McAnnulty* v. *McAnnulty*, 120 Ill. 26; *Swan* v. *Hammond*, 138 Mass. 45; *Fellows* v. *Allen*, 60 N. H. 439; 29 Am. & Eng. Enc. Law, 316. At common law, the will of a man was not revoked by marriage alone, but was revoked by marriage and the birth of a child conjointly. The reason assigned for this revocation was entirely different from that upon which the revocation, by marriage, of a will made by a woman rested. Originally, it was that the circumstances of marriage and the birth of a child wrought such a total change in the testator's situation as to raise the presumption that he could not intend a disposition of property, previously made under wholly different circumstances, to continue unchanged. 1 Jar. Wills, 111; *Lugg* v. *Lugg* 2 Salk. 592; *Gay* v. *Gay*, 84 Ala. 38; *Brush* v. *Wilkins*, 2 John. Ch. 506; *Havens* v. *Van Den Burgh*, 1 Denio 27. Later, the ground of revocation in such cases was determined by the English courts to be, not a presumption of intent on the part of the testator, but a rule of law which annexed to the will a tacit condition that it should not take effect in case of marriage, and the birth of a child not provided for. *Phaup* v. *Wooldridge*, 14 Grat. 332; *Marston* v. *Roe*, 8 Ad. & E. 14; *Israell* v. *Roden*, 2

*Moore* P. C. 51; *Jacks* v. *Henderson* 1 Desaus (S. C.) 543. As the reason for making marriage work a revocation of a will made by a woman, and the reason for making the same act supplemented by the birth of a child who could not take under the will, revoke a will made by a man, were wholly different at common law, except in one respect, namely, that both revocations were acts of the law, not dependent upon the intent of the parties, it is difficult to see how the reasoning of the court, in the case of *Stewart* v. *Mulholland,* can support the conclusion announced, for the statute makes marriage alone revoke a will antecedently executed, whether by a man or a woman, and the common law reason given in the one case could not apply in the other. Another reason for upholding the will, given in that case, is, that the ante-nuptial contract; the will and the marriage, were all one transacation, by reason of which the will was not deemed to have been made before the marriage. Whether this placed the decision upon better ground, need not be determined here.

The case just cited and discussed is the only one produced or found in which, under said 18th section 1 Vic. Ch. 26, marriage is held not to have revoked an antecedent will. Both Kentucky and this state took it from Virginia. It was construed in *Phaup* v. *Wooldridge,* 14 Grat. 332. In that case, Phaup, having made a will in July, 1852, and married in July, 1854, after having entered into a marriage settlement, by which it was agreed that all the wife's property should be settled upon her with general power of disposition, and that she should have no claim upon his estate, died in 1856, without issue of the marriage, leaving his wife surviving him, and it was held that the marriage revoked the will, all the judges concurring. After reviewing the authorities at length, Allen, president, delivering the opinion of the court, says: "The statute of Victoria was understood by the commentator to be free from difficulty, and it is admitted that in England it must be taken literally to effectuate the intention of the legislature. Ours is a literal copy; and why should it not receive the same construction? It lays down a plain rule; it makes one exception; and from what source can the courts derive any authority to make another? Our statute has received the same construction by Lomax, 3d vol. of his Digest, p. 148, which has been

put upon the English statute, and which it is conceded it must there receive. It is argued, however, that where the interests of the new parties brought by the marriage into close relation with the testator are in no wise affected by the will, the reason for such revocation ceases, and therefore the law should not apply. If this position could be maintained, it would result in a repeal of this 7th section of our statute; for in view of the provision of dower for the wife in the realty, her paramount right to her portion of the personality, independent of any testamentary disposition, if she chooses to renounce the provision made for her in the will; and in view of the provision made by the Code, chapter 122, sections 17, 18, p. 518, in favor of the children of the testator pretermitted, or born after the will, or posthumous, the rights growing out of this new relation are sufficiently protected, and therefore there was no necessity for such implied revocation. This might have been an argument against incorporating the provision contained in the statute of Victoria into our Code; but when it has been so incorporated, it is not for the court to say that the legislature did not mean precisely what they have said. They may have thought that as marriage is the most important step a man can take, gives rise to new duties, brings into close connection new parties, and of necessity calls for a different arrangement of his property, it should, without reference to the provision made by law for these new parties, lead to new arrangements in regard to his property."

*Warter* v. *Warter*, P. D. 15, 1890, is an English case, decided in 1890. In 1879, Taylor procured an absolute divorce from his wife, on the ground of adultery with Warter, in an action brought in the High Court of Judicature at Calcutta, India, under the Divorce Act of 1869, which imposed a condition upon the parties not to remarry within six months after the date of the divorce. Warter and Mrs. Taylor went to England and married within that period and Warter executed a will by which he bestowed all his property on Mrs. Taylor, describing her as "My reputed wife." Afterwards, acting under advice of counsel, a second marriage was performed. In a contest over the will, the court held the first marriage void, and the will revoked by the second marriage. So thoroughly agreed

upon the construction of the Wills Act are the English lawyers that the only question argued was whether the first marriage was valid, and the court, after deciding against it, simply said the will was revoked by the second marriage.

The two views taken by the English courts, as to the ground upon which the revocation, in the case of the will of a man rested, which have been referred to, no doubt led to uncertainty and conflict in the decisions and rendered unstable and uncertain titles to property. Where it was put upon the ground of presumed intention, the presumption was rebuttable, and, for overthrowing it, parol evidence was resorted to. *Havens* v. *Van Den Burgh* cited; *Wilcox* v. *Rootes,* 1 Wash. (Va.) 440; *Yerby* v. *Yerby,* 3 Call 28. For some reason, most likely the great evil of uncertainty in the rules of property resulting from this practice, the English Courts discarded the doctrine of presumed intention to revoke, and declared as a rule of law, the revocation of a will by a subsequent marriage and birth of issue, and refused to receive any evidence of intention not to revoke. Pursuing this policy of securing certainty and stability in the rules of law, determining the rights to property, the English Parliament, at about that period when so many great reforms, affecting the landed states of the realm, were introduced, the reign of William IV, and the early part of Victoria, saw fit to extend the rule further and fix it as we now have it in our statute. It was in opposition to this Wills Act that Lord Eldon, feeble and worn out with age and exertions, delivered his last speech in the House of Lords after having unremittingly fought all the reform measures up to that date, and opposed them as innovations upon the constitution of his country. The courts, having been compelled to declare a rule of property on the subject of the revocation of wills, and the legislature having deemed it necessary to fix the rule by an act of Parliament for greater safety, it would be arguing in the face of experience, history and law, both common and statute, to contend that that rule may be set aside by showing an intent, on the part of the testator, not to leave his property subject to its operation. On this subject, Jarman, an English author, says, Vol. 1, 112. "These clauses suggest two remarks:—1st, That, unless in the expressly excepted cases, marriage alone will produce absolute and complete revocation,

as to both real and personal estate; and that no declaration, however explicit and earnest, of the testator's wish, that the will should continue in force after marriage, *still less any inference of intention drawn from the contents of the will,* and least of all, evidence collected *aliunde,* will prevent the revocation."

The evil of uncertainty in the rules of property in Virginia, growing out of the presumption of revocation from marriage and birth of a child, led to the incorporation, into the Virginia statute, of provisions of the Wills Act,1 Vic. C. 26, including the one thus commented upon by Jarman. "The conflict of decision and the evils arising from letting in parol testimony in such cases, so much against the policy of our legislation and the current of decisions in later times, upon the subject of wills, may have had some influence in inducing the legislature, by adopting the provision of the statutes of Virtoria, to put to rest all question as to implied revocations by marriage and the birth of issue. They have done so by declaring that marriage alone, save in the excepted cases, shall be an absolute revocation."

Thus, upon reason and authority, it is clear that the will was revoked, notwithstanding the evidence apparent upon its face of a possible intent that it should remain effective after the marriage.

The next question is, whether the will was revived on the 27th day of July, 1900, by the due execution of the following codicil: "I, John C. Marsh do make this a codicil to my will made on the 6th day of August 1895, I do nominate and appoint J. B. Watson as one of the executors of my will and do hereby revoke the appointment of W. R. Jewell to said will. Given under my hand this 27th day of July 1900. John C. Marsh."

Section 8 of chapter 77 of the Code of 1899, says: "No will or codicil or any part thereof which shall be in any manner revoked, shall, after being revoked, be revived otherwise than by re-execution thereof, or by a codicil executed in the manner hereinbefore required, and then only the extent to which an intention to revive the same is shown." This was taken from section 22 of 1 Vic. Ch. 26. It is insisted that, under this section, a codicil, to have the effect of reviving a will, must refer

to it in such manner as to show, on the face of the codicil, that the testator knew it was revoked and wished to revive it. Some English decisions are referred to which it is argued, support this view, but a careful examination and analysis of them, together with opinions expressed by eminent English jurists, lead to a different conclusion.

Williams on Executors, Vol. 1, p. 187, says, if a codicil is executed according to the exigencies of the new statute, "It will amount to a republication of the will, according to the old law, as above stated, unless it appears on the face of it, that it was not the intention of the testator to republish; or unless the will has been in some manner revoked, in which case the new statute further requires that the codicil should show an intention to revive the will." In a note referred to at the end of the last clause of this quotation, it is shown that, under this statute, a revoked will has been held to be revived by a codicil merely referring to it it as "the last will of me" and as "my said will" and containing no express words of ratification or revival. *Neate* v. *Pickard*, Prerog. T. T. 1843. This note further says: "Again, where one part of a will in duplicate remained undestroyed in the possession of the testator, but the other part in the possession of his solicitor had been destroyed by the testator on the execution of a subsequent will made in 1838, in terms revoking the prior will, it was held that such prior will was revived by a codicil, made subsequently to the second will, though referring to the prior will *merely by date*; for that such reference sufficiently showed 'an intention to revive;' *Payne* v. *Trappes,* 1 Robert 583. See also *Hale* v. *Tokelove,* 2 Robert 318." The reports given in this note are not in the library, but it is not to be assumed the cases are misrepresented in this excellent work.

1 Jar. Wills, 156, says that in *Neate* v. *Pickard,* cited in the note to Williams Ex., the testator *confirmed* his "last will" without referring to the date. The use of the word "confirmed", in the codicil, if that is the meaning of the author, seems not to have been regarded as material. It no more imports an intention to revive or a knowledge of previous revocation, than the words "my will" or "my last will." At any rate, English authority clearly shows such words as "revive, "ratify" and "confirm" are unnecessary." "The deceased executed a will in

1866, and a codicil to it in May, 1871. In November, 1871, he executed a will which revoked all previous testamentary papers. In 1872 he executed a paper which was headed 'This is a codicil to the will of R., dated May, 1866.' It concluded with the appointment of the son as executor of the will and codicil, and the attestation clause commenced, 'Codicil of the will of R., dated, May, 1866, in the presence of,' &c.:—*Held*, that the only intention to be gathered from the words of the codicil was that the testator intended to revive the will of 1866, but not the codicil of May, 1871." In the *Goods of Reynolds*, L. R. 3 P. & D. 35. This codicil contained no express words of revival, ratification or confirmation. . Again, Jarman says, (Vol. 1, p. 155) : "A recognition in a codicil of the earlier of two inconsistent wills, by date or otherwise, as the will on which the codicil is founded, shows an intention to revive such earlier will," citing *Re Reynolds* and *Re Stedham*, 6 P. D., decided in 1881. In the *Stedham Case,* the testator made a will, and afterwards another, which, by implication, revoked the former. Subsequently, by the terms of a duly executed codicil, he, by mistake, referred to the former, instead of the latter, will, and it was held that the codicil, by its language, revived the former will. The reference was: "This is a codicil to my will which bears date the 21st day of May, 1877."

The codicil in each of the cases above referred to make some alteration in the disposition of the testator's property, as found in the will of which it became a part, but this is, by no means, an express declaration of intent to revive, nor a declaration from which such intent can be more readily or clearly inferred than from the reference to the will by its date as "my will." Moreover, it is plain that, in such cases, the courts look to these provisions for the purposes of identifying the will, the intent to revive which, is found in the reference by date and the expression, "my will," or to see whether the intent shown by the reference is contradicted by the provisions of the codicil. *Re Stedham,* 6 P. & D. 205; *Re Reynolds,* 3 P. & D. 35; *Re Steele, Re May* and *Re Wilson* 1 P. & D. 575.

The three cases in 1 P. & D., just cited, all of which, being similar, were disposed of in a single opinion, are relied upon by the appellant as sustaining their view. The opinion, it is true, is a strong argument against revival by implication, since

the passage of the Wills Act of 1 Victoria, but it must be read in the light of the peculiar facts involved. All three cases involved the question, whether a will which had been revoked and for which another had been substituted, was revived by a subsequent codicil. In the first case, a will had been made January 16, 1866, and another October 25, 1866, revoking the former. On January 12, 1868, the testator made a codicil to his "last will and testament, which will bears date the 16th day of January last past." Because of the words, "last will," found in the codicil, it was held not to have revived the will of January 16, 1866. In the second case, the testator made a will January 11, 1860, married August 18, 1860, and on the same day, after marriage, made a second will revoking the first, tore off the signature of his first will in September 1860, and, on July 3, 1861, made a codicil, describing it as "a codicil of the last will and testament of me, John May, &c., and which bears date, the 11th of January, 1860." This codicil, it was decided, did not revive the first will, and thereby revoke the second. In the third case, the testator made a will September 24, 1858, and another July 16, 1861, disposing of all his property. The first will was found after his death with the signature torn off and had been used by him as a draft for the second. On December 20, 1864, he made a codicil declaring it to be a codicil to his "last will and testament, dated the 24th of September, 1858," but the contents of the codicil plainly showed that he really meant the will of 1861, and probate of that will was granted.

By way of introduction, the court said, in its opinion in these three cases: "This is a question of construction." In the construction of these three codicils, the court kept in mind certain rules, one of which is that a codicil will not, in law, revive the first will, in such case, if it has been, not only revoked, but destroyed, *animo revocandi,* as was true of the first will in each of the last two cases. For this, *Hale* v. *Tokelove,* 2 Robert 318; *Newton* v. *Newton,* 5 L. T. (N. S.) 218; and *Rogers* v. *Goodenough,* 2 Sw. & Tr. 342, were referred to. Another rule was that the intent was to be determined and ascertained by a reasonable construction of the language used and not by any binding force which the law attached to certain words or expressions, for which proposition *Payne* v. *Trappes,* 1 Robert

583, and *Marsh* v. *Marsh,* 1 Sw. & Tr. 533, were cited.   Another was, that the surrounding circumstances and situation of the testator might be considered in connection with the papers left by him, as in other cases, calling for construction and interpretation of written instruments.   Another was that the intent manifested by a reference in a codicil to a revoked will might be contradicted and overborne by the provisions and recitals of the codicil itself.   All these rules, applied to the facts in the several cases, lead unmistakably to the conditions adopted by the court, without denying, or in any manner impairing, the proposition that a codicil, by referring to a revoked will, describing it by date and as the will of the testator, will, in the absence of contradictory matter, or circumstances calling for the application of the rules of construction referred to, revive the will.   The following extract from the opinion establishes the correctness of this analysis of it:   "It is proper here to take note of the case of *Payne* v. *Trappes.*   In that case there would seem to have been but little beyond the reference by date to show the intention to revive a former will.   But the court did not lay down the proposition that the date alone was sufficient; on the contrary, the learned judge said he must 'gather the intention from the codicil itself;' 'that the intention to revive the former will was clearly shown;' and 'that the testator had taken great pains to describe the instrument to which the paper was intended as a codicil.'   The decision proceeded upon the ground that the judge was convinced of the testator's intention, not that he felt bound by the language in the face of an opposite conviction.   On the other hand, I am much fortified in the view I take of the meaning of the statute by the remarks of Sir C. Cresswell in the case of *Marsh* v. *Marsh.*   I allude to his statement that the words 'last will' and *'prima facie'* refer to the real last will, and particularly to the opinion he there expressed, that 'it appears to have been the object of the legislature to put an end equally to implied revocations and implied revivals.'"

Nor does this view conflict with the enunciation of the law found in the syllabus, which reads, in part, as follows:   "In order to satisfy those words the intention must appear on the face of the codicil, either by express words referring to a will as revoked and importing an intention to revive the same, or by

a disposition of the testator's property inconsistent with any other intention, or *by some other expression conveying to the mind of the Court with reasonable certainty the existence of the intention.* Since the passing of the statute a will cannot be revived by mere implication." These cases belong to a class, forming no exception to the general rule, but calling for a cautious application of it. It is referred to by Jarman, Vol. 1, pp. 155, 156.

To attempt a review of all the English and Canadian cases bearing on the question, would be a waste of time. Enough has been shown to make it clear that these authorities do not support the contention of counsel for appellant, and some attention will now be given to the Virginia cases. The Virginia statute and ours differ from that of 1 Victoria in phraseology but evidently not in meaning or effect. Section 22 of 1 Vic. Ch. 26, reads as follows: "No will or codicil, or any part thereof, which shall be in any manner revoked, shall be revived otherwise than by the re-execution thereof, or by a codicil executed in manner hereinbefore required, and showing an intention to revive the same; and when any will or codicil which shall be partly revoked, and afterwards wholly revoked, shall be revived, such revival shall not extend to so much thereof as shall have been revoked before the revocation of the whole thereof, unless an intention to the contrary shall be shown." It contains two clauses, and it is manifest that our legislature has compressed both into one by changing the language of the first, from the words, "showing an intention to revive the same," so as to read "and then only (to) the extent to which an intention to revive the same is shown." As the second clause of the English act has not been, in terms, adopted by ours, and the report of the revisors, recommending the enactment of our present statute, has failed to assign any reason for the change in the language of the first clause, and, on its face, it appears to have been the result of an effort to combine both in one, it is fair to assume that such was the case, and that there was no intention to alter the sense or effect of section 22 of 1 Victoria Ch. 26 in so adopting it in different language, and condensed form.

Only two cases have been decided in Virginia, which are said to bear upon the question of the constructi on of our

statute, section 8, chapter 77, Code, since it went into effect in
that state in the year 1850, and neither of them is directly in
point. *Carr* v. *Porter,* 33 Grat. 278, was decided in 1880, but
the will and codicil involved were dated, respectively, 1819 and
1820, and they were governed by the common law rules. More-
over, it was not a case of revival of a revoked will, but one of
republication of an existing will so as to bring it down to the
date of the codicil and thereby make it effective, under the
statute abolishing estates tail. Under the present statute, as
well as at common law, there seems to be a difference between
revival and republication. See *Bilke* v. *Roper,* 45 Chy. Div.
632; Williams Exrs. 187. For this additional reason, it is al-
most wholly inapplicable here. *Hatcher* v. *Hatcher,* 80 Va.
169, was decided on the principles governing republication in-
stead of revival also. "Upon a paper whereon there was writ-
ing, dated 1858, and purporting to dispose of H's property, but
without signature or attestation, H., in 1864, wrote another
instrument with the caption 'Codicil to the above will,' which
instrument was duly executed and attested. *Held*: The exe-
cution of the codicil effects the republication of the will, and
brings the latter down to the date of the codicil, so that both
speak as of the same date." *Hatcher* v. *Hatcher supra.*
Whether, in law, it was a republication of an existing will or the
execution of a will which had never before existed, as insisted
by counsel for appellant, it is quite plain that it was not a re-
vival of a revoked will, and, therefore, the statute had no ap-
plication. Common law principles governed it. The difference
between republication of an existing will, and revival or repub-
lication of a revoked will, by a codicil, is, that in the latter
case the codicil must show an intent to revive, while in the
former it need not, the statute being silent on the subject, in
consequence of which the common law, as modified by the
statute of frauds, governs. Williams Exrs. 186; 1 Jar. Wills,
158, 159. If, however, it could be said there is no such dis-
tinction, and the Virginia decisions referred to, or either of
them, are authorities upon the question of revival under the
statute, they uphold the views expressed here.

The codicil in this case not only refers to the will by its date,
and describes it as "my will" but revokes the appointment of
one of the executors and names another in his stead. It leaves

no room for question or doubt as to the identity of the will to which it refers, and appoints an executor for the will referred to, not an executor merely. It says, "I do nominate and appoint J. B. Watson as one of the executors of my will and do hereby revoke the appointment of W. R. Jewell to said will." The will referred to had named two executors, and the codicil said Watson should be one of the executors of his will. All this could mean nothing short of an intent that the will referred to should be carried into effect. This sufficiently evidences an intent to revive, as shown in the authorities cited. Jarman says, Vol. 1, p. 159: "In *Scrocold* v. *Hemming*, (2 Lee Eccl. Rep. 490, not in our library,) a testator wrote at the bottom of his will a codicil not expressly mentioning the will, but directing certain annuities to be paid 'by my executors above named;' it was held that the reference was sufficient to revive the will." And this seems clearly to have been since the passage of the statute.

The rulings of the court, verdict of the jury, and decree complained of being in conformity with the principles here announced, it is unnecessary to enter upon discussion of the exceptions to the rulings of the court. It is admitted by counsel on both sides that the only question involved is the construction of the statute and sufficiency of the codicil to revive, in case the will is held to have been revoked.

The decree is right and will be affirmed.

*Affirmed.*